**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

DAT SOLUTIONS, LLC, a limited liability company,

          Plaintiff,

v.

JOHN CELORIA, and DOES 1-10, individuals,

          Defendants.

---

**COMPLAINT**

---

Plaintiff DAT Solutions, LLC ("DAT" or the "Company") by and through its undersigned attorneys, for its Complaint against Defendant John Celoria ("Celoria") and Does 1-10 alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.     This is an action by DAT against its employee, John Celoria, for stealing DAT's trade secrets and breaching his Confidentiality, Non-Solicit, Non-Compete, and IP Assignment Agreement. An internal DAT investigation has revealed that Mr. Celoria, while still employed by DAT, secretly downloaded DAT's proprietary and confidential documents and information, including highly sensitive and mission-critical trade secrets, and disseminated them to at least one third party, with the intent to disseminate them to a far wider audience and injure DAT. Mr. Celoria and Does 1-10 have already provided at least one third party with access to DAT's trade secret information and have intimated that they intend to further disseminate the trade secrets and confidential information unlawfully taken from DAT. Because disclosure of DAT's proprietary

information would cause the Company immeasurable and irreparable harm, DAT asks this Court for expedited equitable relief.

2.      DAT is a freight-matching service that deploys a suite of software solutions to millions of customers every day—customers who depend on DAT for the most relevant data and most accurate insights to help them make business decisions and run their companies more profitably.  DAT is a world class technology company that has been at the leading edge of innovation in transportation supply chain logistics for almost a half century.  DAT's core business relates to matching customers who need to access methods for shipping freight and other shipping solutions with freight carriers offering such services.

3.      Because the nature of DAT's business is the digital marketplace, the data DAT collects for implementing, operating, and improving its platforms are among DAT's most valuable assets.  All of DAT's proprietary data for DAT's platforms derive substantial value from being kept secret.  If someone were to obtain unauthorized access to or misappropriate this data or information, the consequences would cause DAT irreparable harm.

4.      To protect that data and information, DAT and its parent company, Roper Technologies, Inc. have set up robust security protocols and controls designed to protect its data, its customers, and the livelihood of its business.  The selection of which  protocols and controls to deploy and how they interact with each other are DAT's trade secrets and are kept strictly confidential within DAT and its parent company.  DAT does not share this information  with the public or anyone outside of DAT or its affiliated companies.

5.      Defendant Celoria, however, has unlawfully and improperly downloaded this confidential and trade secret information, with an intent to disseminate this information widely

and harm DAT.  Through his employment at DAT as a Senior DevOps Engineer, Mr. Celoria gained unauthorized access to certain confidential and proprietary information through deceptive means.  Despite DAT's efforts to strictly control access to its trade secrets and confidential information, Mr. Celoria deliberately and improperly gained access to and misused such information.  This includes, but is not limited to, information relating to the security controls used by DAT in its computer systems that support its business.

6.      Mr. Celoria knew from his date of hire that his access to DAT sensitive and confidential information was limited to using it for the advancement of DAT's business objectives. When hired, Mr. Celoria signed a "Confidentiality, Non-Solicit, Non-Compete, and IP Assignment Agreement" (the "Confidentiality Agreement") and acknowledged in writing the receipt of other policy documents setting forth explicit duties and obligations surrounding the acquisition, use, and disclosure of DAT's confidential and proprietary information.  Mr. Celoria also received regular training regarding these policies, including training that emphasized the strict confidentiality policies reflected in the Confidentiality Agreement and elsewhere.

7.      Notwithstanding these obligations of secrecy, Mr. Celoria has improperly and unlawfully accessed, used, and disclosed DAT's confidential information and trade secrets. DAT's internal investigation has recently uncovered that Mr. Celoria improperly downloaded at least three gigabytes of DAT's confidential material related to the implementation and maintenance of numerous highly confidential techniques and structures that are critical to  the integrity and security of DAT's commercial platforms and products.  This confidential information includes the design and operation of DAT's robust security network, at least one customer list,

unauthorized screen shots and video recordings, and a spreadsheet documenting various findings
and indexing the sensitive information.

8.      Upon information and belief, Mr. Celoria has taken this information and provided
access to at least one third party outside of DAT. Mr. Celoria's conduct violates the unambiguous
terms of his Confidentiality Agreement. It also constitutes a misappropriation of DAT's trade
secrets in violation of federal law, and the threat of a widening violation of his confidentiality
obligations and DAT's trade secrets is imminent.

9.      As a result of Mr. Celoria's breach of the Confidentiality Agreement and
misappropriation of DAT's trade secrets, DAT will suffer immediate and irreparable harm unless
the Court grants injunctive relief, enjoining Mr. Celoria from disclosing or disseminating any such
information to any third party. Due to the sensitive nature of the trade secrets and other
confidential information taken, and the imminent threat to DAT as a going concern caused by Mr.
Celoria's conduct including the threat of widespread dissemination of same, DAT asks this Court
to grant DAT expedited injunctive relief, including a temporary restraining order and preliminary
injunction.

## PARTIES

10.     Plaintiff DAT is a Delaware limited liability company with its headquarters co-
located in Beaverton, Oregon and Denver, Colorado.

11.     Defendant John Celoria is an individual residing at 9098 W. Chestnut Ave.
Littleton, CO 80218.

12.     On information and belief, Defendants Jane and John Does 1-10 are persons who participated in the acts alleged herein, and who later may be specifically identified as parties herein.

## JURISDICTION

13.     The Court has federal question jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Specifically, DAT alleges Defendant Celoria violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.,* by intentionally misappropriating DAT's trade secrets. The Court has supplemental jurisdiction over the remaining state law claim pursuant to 28 U.S.C. § 1367(c)(4).

14.     The Court has personal jurisdiction over Mr. Celoria because he is a Colorado resident and because he executed the Confidentiality Agreement, which provides in relevant part that "legal action arising from this Agreement shall be brought in the state where I was last employed for the Company (based on the office or location I was assigned to by the Company for reporting purposes) or in the state where Employer is headquartered or in the state where I reside at the time the legal action is commenced." In all three instances, that location is Colorado.

15.     This Court is the appropriate venue to maintain this action pursuant to 28 U.S.C. § 1391(b)(1) and (2), because Mr. Celoria resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTS

### A.     DAT Develops World Class Freight Tracking Software

16.     DAT is a software and analytics company that has been at the leading edge of innovation in transportation supply chain logistics for almost a half century.  DAT's core business relates to matching customers who need to access methods for shipping freight and other shipping solutions with freight carriers offering such services.  These include DAT One; DAT iQ; and Trucker Tools.  In acting as a freight-matching service, DAT deploys a suite of software solutions to millions of customers every day, customers who depend on DAT for the most relevant data and most accurate insights to help them make business decisions and run their companies.  DAT continues to set the standard for analytics innovation in the trucking and logistics industry.

### B.     DAT's Trade Secrets and Proprietary Information

17.     DAT's commercial platforms require the creation, implementation, and ongoing maintenance of a security framework that contains numerous highly confidential protocols and controls to ensure the integrity and security of its commercially sensitive and highly valuable company and customer data.  The internal structure of DAT's security framework and its various platforms, the data DAT collects for implementing, operating, and improving its platforms, and the information regarding its customers and competitors are valuable trade secrets and fundamental to the successful operation of DAT's business.

18.     DAT's security protocols are critical for DAT's internal operations and for preventing DAT's and its customer's information from being exposed to outside cyber security risks.  The security protocols and procedures establish a number of confidential and proprietary benchmarks that are constantly evolving to protect DAT's and its customers' assets.  The

- 6 -

implemented protocols are the result of thousands of personnel hours and millions of dollars invested by DAT and its affiliates over a substantial period of time.

19.      If the network design and techniques implemented by DAT's security system were compromised and made available to competitors or potential threat actors, it could result in acute and irreparable damage to both DAT's ongoing business.

**C.      DAT Aggressively Protects Its Confidential Information and Trade Secrets.**

20.      To protect DAT from the misappropriation or unauthorized disclosure of highly sensitive information, including DAT's trade secrets and confidential information, DAT uses multiple layers of secrecy measures to safeguard that information.

21.      First, DAT requires all new employees upon their hiring to review and sign a confidentiality agreement just like the Confidentiality Agreement Mr. Celoria signed.  Under the Confidentiality Agreement, employees agree not to engage in any unauthorized use, transmission, copying, or disclosure of DAT's confidential information.  Employees may also be required to sign additional addenda to the Confidentiality Agreement addressing specific access to certain trade secret and confidential information as required by their individual roles at DAT.

22.      Employees are also provided and must acknowledge receipt of other relevant policies addressing the use and treatment of confidential information and trade secrets, and the harm caused by any misappropriation or unauthorized disclosure of highly sensitive information. Those policies include:

         a.   **Rules of Conduct** – The Rules of Conduct explain that removal, release, or
              disclosure of DAT's Confidential Information, as defined in the Confidentiality

Agreement, and trade secrets is considered unacceptable conduct that could lead to disciplinary action, up to and including termination.

b. **Acceptable Use Policy** – The Acceptable Use Policy outlines permissible and prohibited usage of company issued equipment, which includes provisions prohibiting the disclosure of confidential and proprietary information.

c. **Information Security Policy** – The Information Security Policy defines the security requirements that apply to the information assets of DAT and further outlines various policies for protecting DAT's Confidential Information.

d. **Management of Potential Conflicts of Interest Policy** – The Management of Potential Conflicts of Interest Policy provides guidelines for respecting a DAT employee's right to engage in activities outside of their employment while balancing DAT's interest in preventing conflicts of interest. The guidelines prohibit misuse or unauthorized disclosure of DAT's Confidential Information.

23.    In addition to the above-referenced agreements and policies, DAT also implements other policies and procedures designed as reasonable measures to protect and safeguard its trade secret and confidential information.  Thus, in furtherance of DAT's goal to protect not only its own trade secrets and highly valuable confidential and proprietary information, but also its customers' and partners' information, DAT implements various data, network, and device protocols. Such protocols include, but are not limited to:

a. **Data Loss Prevention Tools**, which DAT utilizes to detect, monitor, and prevent the unauthorized leakage of its confidential information.

b. **Monitoring Programs**, which DAT utilizes to maintain a log of all network activity including network emails, software, and devices to identify any possible leakage of DAT's confidential information. Specifically, Google Workspace is used for monitoring network activity within DAT's Google Workspaces.

c. **CrowdStrike Falcon Data Protection**, which is a cloud-based security solution that protects DAT's endpoint users and monitors DAT's data to protect it from threats such as malware, ransomware, or other cyber-attacks.

d. **ProofPoint Email Protections**, which is an integrated email protection solution and security platform that protects DAT endpoint users from malware email threats.

e. **Document Marking** – DAT encourages all employees to conspicuously mark all confidential and proprietary documents so that anyone accessing a marked document knows the document contains protected information.

f. **Digital Repository Restrictions**, whereby DAT regularly restricts access to its digital repositories, Confluence[1] and Google Workspace[2], either to the repositories themselves or within specific folders and drives contained in the repositories such that only authorized personnel have access.

g. **Document Restrictions**, whereby DAT employees are instructed and have the regular practice of restricting access to specific documents, data, and information

---

[1] Confluence is a web-based, a digital workspace or corporate wiki platform developed by Atlassian Corporation Plc used for collaborating, organizing, and sharing information.

[2] Google Workspace is a collection of Google's cloud-based productivity and collaboration tools such as Gmail, Google Drive, Google Docs, Google Sheets, Google Slides, Google Meet, Calendar, and Google Chat.

within their repositories and folder drives such that only authorized personnel have

access.

**D.     Celoria Joined DAT and Agreed to Protect DAT's Confidential and Trade Secret Information.**

24.     Mr. Celoria joined DAT on April 21, 2023, as a fully remote Senior DevOps

Engineer.  As a Senior DevOps engineer, Mr. Celoria's primary responsibilities included working

on and improving our Gitlab automation/pipelines.  In addition to his primary responsibilities, his

general job duties at DAT also included improving guidelines and automation solutions related to

DevOps practices, and participating in system design, platform management, capacity planning,

and system optimization.  Mr. Celoria's job duties and responsibilities did not include oversight

for DAT's security framework or the selection or operation of DAT's security protocols or

controls.

25.     As part of Mr. Celoria's onboarding at DAT, he agreed to review and acknowledge

additional agreements and policies described in Paragraph 23, many of which are targeted at

ensuring Mr. Celoria understood the nature of the trade secrets and confidential information to

which he would have access to and the obligations he had to properly handle and safeguard such

materials.  Indeed, in his role at DAT, Mr. Celoria understood he would have access to certain

confidential information required to complete his job responsibilities.  His access to confidential

information and trade secrets, however, like all other DAT employees, was limited to the

information needed to perform his individual duties.

26.     To that end, on April 22, 2023 Mr. Celoria signed a Confidentiality Agreement, a

true and correct copy of which is attached hereto as Exhibit A, which contains various obligations

he agreed to and acknowledged.  For example, Mr. Celoria acknowledged that DAT "will provide

me with access to Confidential Information (including trade secrets) related to my position, and
may also provide me specialized training related to the Company's Business and/or the opportunity
to develop relationships with the Company's employees, agents, and business contacts (customers
and others) for the purpose of developing goodwill for the Company." Ex. A at ¶ 1.

27.     Mr. Celoria also recognized the significant and serious obligations he was required
to  follow in receiving such confidential and trade secrets information.  The Confidentiality
Agreement defines Confidential Information to mean "an item of information or data or
compilation of information or data in any form (tangible or intangible) related to the Company's
Business that I acquire or gain access to in the course of my employment that the Company has
not authorized public disclosure of, and that is not readily available to the public or persons outside
the Company." Ex. A, at ¶ 2.  Pursuant to Paragraph 2 of the Agreement  Mr. Celoria promised:

a.     "to use the Company's Confidential Information only in the performance of my
duties, to hold such information in confidence and trust, and not to engage in any
unauthorized use, transmission, copying, or disclosure of such information during
my employment and for so long thereafter as such information qualifies as
Confidential Information."

b.     "I will not upload, download, copy or transfer any Confidential Information to any
electronic storage repository or device, and/or to any third party, or reverse
engineer, disassemble or decompile, misappropriate or otherwise attempt to gain
unauthorized access to any Confidential Information."

c.     "I acknowledge that items of Confidential Information are the Company's valuable
assets and have economic value because they are not generally known by the public
or others who could use them to their own economic benefit and/or to the
competitive disadvantage of the Company."

d.     "I agree that all records, in any form (such as email, database, correspondence,
notes, files, contact lists, drawings, specifications, spreadsheets, manuals, and
calendars) that contain Confidential Information or otherwise relate to the
Company's Business, with the exception of wage and benefit related materials
provided to me as an employee for my own use as an employee, are the property of
the Company (collectively "Company Records"). I will follow all Company

policies regarding use or storage of Company Records, and return all such records (including all copies) when my employment with the Company ends or sooner if requested."; and

e.      "The Company's trade secrets will remain protected for as long as they qualify as trade secrets under applicable law. Items of third party Confidential Information will remain protected for as long as allowed under the laws and/or separate agreements that make them confidential. Nothing in the foregoing shall be construed to permit me to recreate records of Confidential Information from memory or retain copies of Confidential Information in any form after my employment with the Company ends. I understand that I should have no records of this kind in my possession or control with which to refresh my memory after my employment with the Company ends."

28.      Similarly, Mr. Celoria also confirmed in Paragraph 6 of Confidentiality Agreement: that "it is reasonable and necessary for the protection of the goodwill and continued business of the Company that I abide by the covenants and agreements contained in this Agreement during and following my employment with the Company."  Ex. A, at ¶ 6.

29.      Importantly, the Confidentiality Agreement made clear that the unauthorized use or dissemination or other misappropriation of the Company's trade secrets and confidential information would result in irreparable and immediate harm to DAT:  "The parties agree that the Company will suffer irreparable harm, in addition to any damages that can be quantified, by a breach of this Agreement by me."  Ex. A, at ¶ 6.

30.      Mr. Celoria also signed an Addendum to the Confidentiality Agreement on August 31, 2023, related to the receipt of sensitive rate information.  The Addendum re-emphasized that Mr. Celoria's "employment agreement has non-disclosure and confidentiality terms that prohibit me from disclosing or exposing customer confidential information external to DAT and internal to other unauthorized DAT employee(s), for any reason. Such confidential information includes

but is not limited to Sensitive Rate Data[3] and any information from databases that contain rates.  I

acknowledge that this Agreement and applicable law prohibits me from making use of confidential

information obtained from Sensitive Rate Data other than for DAT internal development

purposes."

31.     Mr. Celoria further promised "to treat all Sensitive Rate Data (as defined above) as

highly confidential and proprietary and shall comply with the requirements stated above."

32.     To further emphasize the importance of DAT's company policies including the

various protections for Confidential Information, upon hiring all DAT employees are also required

to undergo training courses on the policies.  DAT employees are also required to participate in

annual refresher training courses on the company policies after completing their first year of

employment.  Mr. Celoria was required to and did complete the training that reminded him of his

duties of secrecy.

**E.     Celoria Exhibits Behaviors Inconsistent With Company Policy and Protocols.**

33.     After working at DAT for a time, Mr. Celoria began to exhibit conduct inconsistent

with Company culture related to his apparent obsession with company security and protocols,

despite having duties elsewhere.  Mr. Celoria exhibited aggressive and unwarranted behavior

arising out of his ill-informed perception of DAT's network security framework and controls.

34.     For example, on October 25, 2024, Mr. Celoria posted a message on the company's

general Slack[4] channel, which includes all 600+ DAT employees.  In that message, he called out

by name the individual employees he felt had not updated (also referred to as "rotated") their

---

[3] Sensitive Rate Data is highly confidential information provided by DAT customers.
[4] Slack is a popular cloud-based messaging application designed for teams and organizations to communicate and collaborate in real time through channels, direct messages, and integrated tools.

passwords or other security keys recently enough.  Mr. Celoria considered such failure to be a security threat.  In response to this post, DAT personnel met with Mr. Celoria to ask him to delete the post and mentored him that public shaming of this kind was not appropriate and against DAT's workplace cultural goals.

35.     Although Mr. Celoria ultimately removed the post, he continued to make several emotional yet unfounded comments suggesting that DAT's password and security key rotation policy and other "security issues" (that he alone perceived as vulnerabilities) were national security threats that could result in "the loss of life."  While alarming, DAT considered Celoria's comments to be misplaced and ill-informed, rather than anything that warranted further investigation at that time.

36.     Mr. Celoria appeared to exhibit signs of stress during his tenure with DAT.  In his short time with the company, Celoria took two sabbaticals or long-term leaves of absence.  In the weeks following the October 25, 2024, meeting, Mr. Celoria stated that he was under significant stress due to his current job obligations and responsibilities, which he believed were compounded by his fear of security threats or vulnerabilities from outsiders.  In response to the stress, Mr. Celoria took a two-month sabbatical from work to "clear his head."

37.     Mr. Celoria eventually returned from his scheduled leave, but in late August 2025, he continued to exhibit an obsession with security threats.  He repeatedly voiced unsubstantiated and ill-informed concerns regarding perceived security risks and made baseless accusations about the competence of DAT leadership.  At one point, Mr. Celoria called the Chief People Officer at DAT to inform her that "he was not crazy" because he had filed another complaint with DAT's parent company.

38.     In an effort to address and hear Mr. Celoria's concerns, despite the fact that they lacked a rational basis, DAT executives met with Mr. Celoria on multiple occasions, each of which resulted in Mr. Celoria making unwarranted and unsupported assertions regarding the security threats he perceived DAT was vulnerable to.

39.     These meetings culminated in an August 27, 2025, meeting with Mr. Celoria and various DAT executives.  During that meeting, Mr. Celoria again expressed to the group his concerns that DAT had security issues that were a threat to national safety and that if these issues were not addressed, "people would die."  Mr. Celoria stated that he believed he was protecting and saving American lives by raising these concerns.

40.     During this meeting Mr. Celoria revealed that he had been video recording most, if not all, conferences and calls that he had with DAT personnel regarding security matters, without the knowledge or consent of the individuals on the calls.  Mr. Celoria further revealed that he had taken numerous screen captures of Slack conversations between DAT employees and that he claimed provided evidence for his security concerns.

41.     Throughout the August 27 meeting, Mr. Celoria repeatedly theorized hypothetical scenarios where his perceived security vulnerabilities could lead to national security threats including mass casualties.  Mr. Celoria was asked to send DAT executives examples of his perceived security vulnerabilities and his supporting evidence.

**F.     Celoria Reveals That He Stole DAT Trade Secrets and Confidential Information**

42.     In response to the request, Mr. Celoria sent a zip file to the DAT executives that contained documents related to DAT's network security framework and controls, at least one

customer list, screen captures, video recordings, and a spreadsheet documenting his findings and

indexing the purported support for his concerns.

43.    The zip file Mr. Celoria sent to the DAT executives was alarming because it

included highly sensitive confidential and trade secret information of DAT that Mr. Celoria should

not have had in his possession.  Specifically, that email and the attached zip file contained

information and data related to DAT's network security framework and controls.  This included

protocols, checklists, compliance efforts, and unauthorized recordings of meetings regarding these

and other confidential topics.  If such highly sensitive data fell into the wrong hands, it could

enable a skilled hacker to access DAT's systems and steal or misappropriate not only DAT's

confidential and proprietary information, but potentially customers' information, as well.

**G.    DAT's Internal Investigation Reveals Celoria Improperly Accessed, Used and Downloaded Files and Intends to Disclose That Information To the Public.**

44.    Mr. Celoria's August 27, 2025, email and its contents indicated to DAT that Mr.

Celoria was an internal security threat to the company and that he had already engaged in the

unauthorized access and removal of confidential and proprietary DAT information.  Thereafter,

DAT's Director of Information Security was tasked with further investigating and recovering the

information contained on Mr. Celoria's work laptop. The Director of Information Security opened

a Cyber Incident investigation into the matter, after which DAT began collecting data and

examining various data repositories to determine the extent of Mr. Celoria's unauthorized and

improper access and removal of highly confidential business and security information to personal

devices and third-party locations.

45.    DAT's Information Security team was able to remotely access Mr. Celoria's DAT-

issued work laptop and conduct a remote forensic scan. Although the investigation is ongoing, the

Information Security team identified at least 3GB (three giga-bytes) of data taken from Mr.

Celoria's work laptop that he improperly possessed, including : (i) numerous documents related to

DAT's security controls; (ii) materials evaluating  the migration status of DAT's active security

controls  to the recommended network security controls provided by DAT's parent company;[5] (iii)

approximately one-hundred video recordings of conversations with DAT personnel that were

recorded without the participants' knowledge or consent; and (iv) numerous screens captures of

private Slack conversations.

46.    Many of the documents, recordings, and screen captures related to DAT's network

security framework and controls are of grave concern because if they landed in the wrong hands,

such documents could be used by bad actors as a road map to identify potential security

vulnerabilities in DAT's network that could be probed to access DAT's valuable highly

confidential security and customer information and trade secrets.

47.    Mr. Celoria downloaded these materials even though they were not necessary for

him to do his job at DAT.

48.    Upon information and belief, Mr. Celoria downloaded this data and made these

recordings on his own personal devices, outside of DAT's secured environment.

49.    Upon information and belief, Mr. Celoria also copied confidential information and

data related to DAT's network security framework and controls onto personal thumb drives or

other portable storage devices.

---

[5] DAT is a subsidiary of Roper.  Roper provides its subsidiaries a standard network security control
framework that its subsidiaries are to use as a model network security framework.

50.     Upon information and belief, Mr. Celoria did not need to access such materials for performing his job responsibilities, nor was he instructed to do so.  Without such a need or basis, Mr. Celoria had no legitimate business purpose for downloading documents, recording conversations, or taking screen captures of Slack messages related to DAT's security controls. Upon information and belief, Mr. Celoria procured the materials for the sole and unlawful purpose of harming DAT. If further dissemination of this highly confidential and proprietary information is not prevented, DAT's operations will be put at serious risk.

**H.     Celoria Is Prepared to Disseminate DAT's Confidential Information and Trade Secrets**

51.     The forensic scan also identified a private wiki[6] that was hosted on a Docker container[7] on Mr. Celoria's DAT-issued laptop.  Upon information and belief, Mr. Celoria used the private wiki for uploading, storing, tracking, and cataloging the documents, screen captures, and recordings containing confidential information.

52.     The DAT Information Security team was able to discover that the private wiki was accessed by at least one person other than Mr. Celoria himself.  Upon information and belief, the other person who accessed the private wiki was an associate of Mr. Celoria's who is not and has not ever been affiliated with DAT or any of its affiliated companies.

---

[6] A private wiki is a website that is hosted on an external server or cloud platform that includes controls on the individuals that my access the website.

[7] Docker is a web development tool that allows users to create portable web environments for building, testing, and running web applications locally through the creation of "containers." Containers are isolated environments that include the necessary functionalities for running an application. For example, a user can use Docker to build a local version of a website, such as a wiki, and then publish that same website online through Docker's containerization and deployment capabilities.

53.     Upon information and belief, DAT's confidential information and trade secrets face a significant threat of additional and potentially irreparable disclosure because Mr. Celoria made several threats to DAT personnel during a discussion on August 27, 2025, that he would publicly release the information in his possession.  Further, as alleged above, Mr. Celoria has already made at least one unauthorized public disclosure of DAT's confidential information and trade secrets.

54.     DAT's Information Security team also concluded that Mr. Celoria used his elevated Amazon Web Services ("AWS") credentials to bypass security protocols and access DAT's AWS environment and developer environment/tools to take screen captures of configuration settings and security posture management.  In doing so and then exfiltrating the information, Mr. Celoria violated his confidentiality obligations and the policies of DAT.

55.     Further investigation has revealed that Mr. Celoria misused his elevated AWS credential to access the network control framework, an area he was not authorized to access.  Although there are systems in place to restrict access to this part of DAT's security system, Mr. Celoria used unauthorized mechanisms to circumvent those restrictions.

56.     Upon information and belief, Mr. Celoria recruited at least one other person at DAT to aid him in his unauthorized collection of data and documents that he should not and would not otherwise have access to.  DAT's investigation into the identity of that suspected collaborator is ongoing.

57.     The investigation into Mr. Celoria's actions also unearthed his personal blog, named Celoria Consultation (hosted at the domain celoria.us), which includes a blog post from April 10, 2025, titled "How to get Auditable Data."  This blog post provides step-by-step instructions to guide the reader through accessing and removing company information without

getting caught.  The blog post also explains Mr. Celoria's method for screenshotting, exporting

the screenshot as a pdf, locking the screenshot and pdf export of the files, and maintaining a

spreadsheet to catalog and record the inventory of the captured materials.

58.    The blog post further contains a statement that Mr. Celoria "bought a dozen 32GB

thumb drives, and a new yubikey[8]" for storing large amounts of data.  On information and belief,

Mr. Celoria has accessed and unlawfully removed significantly more than the 3GB of data that has

been currently identified from the remote inspection of Mr. Celoria's work-issued laptop.  Given

the number of thumb drives that Mr. Celoria stated he purchased in his blog post, it is possible that

he may have downloaded and exfiltrated as much as 386 GB of DAT's confidential information

onto those thumb drives.

**I.    Celoria Fails to Confirm That He Will Abide By His Obligations To Protect And Not
Misuse DAT's Trade Secrets and Confidential Information.**

59.    On August 28, 2025, Mr. Celoria had a meeting with DAT's Chief People Officer,

during which Mr. Celoria sought to be placed on leave with DAT.  The next day, Mr. Celoria was

informed that DAT leadership had approved the requested leave and supplemental salary payments

he asked for.  DAT then locked down Mr. Celoria's laptop and he was no longer granted access to

DAT's systems.  DAT personnel also reminded Mr. Celoria of his confidentiality obligations that

he signed during his employee intake, and that since there was an ongoing investigation into his

security concerns, he should not speak to any third parties about the contents of our investigation

and his claims other than government agencies.  DAT also requested that Mr. Celoria physically

---

[8] Yubikey is a physical form of two factor authentication that can be used to encrypt files and
require an input of the yubikey into a usb drive on the machine as an authentication device rather
than receiving a code.

return his laptop.  On September 1, 2025, DAT received an email from Mr. Celoria that he was returning the DAT laptop on that day.  DAT also received an electronic receipt from FedEx that a package had been deposited by Mr. Celoria addressed to DAT's office in Colorado.

60.    On September 3, 2025, Craig Womack, Ropers' Vice President and Chief Compliance Officer, contacted Mr. Celoria in an effort to amicably retrieve all of the information and materials that Mr. Celoria had improperly accessed and removed from DAT's possession and control.  When Mr. Celoria refused to provide the straight forward assurances requested by Mr. Womack to (i) avoid any further dissemination of the stolen materials and (ii) return all copies of the information and documents taken, counsel for DAT reached out to Mr. Celoria to remind him again of his confidentiality obligations set forth in the Confidentiality Agreement and relevant Addendums and under applicable law, as well as to seek Mr. Celoria's written confirmation that he intends to comply with those obligations.  Mr. Celoria was specifically advised that any further dissemination or use of DAT's trade secrets or confidential information would significantly and irreparably harm DAT.  Mr. Celoria has failed to respond to the request for his written confirmation that he will comply with  his obligations.

## COUNTS

### COUNT I: BREACH OF CONTRACT
**Against Defendant Celoria**

61.    DAT incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

62.    The Confidentiality Agreement, including the relevant addenda, is a valid, binding, and enforceable written agreement.

63.     The Confidentiality Agreement, which Mr. Celoria executed as a condition to his

employment with DAT, was supported by consideration.  The Confidentiality Agreement is

reasonable in duration and scope, and is designed to advance a legitimate interest of DAT.

64.     Mr. Celoria violated the Confidentiality Agreement in numerous ways, including

by: using DAT's confidential information for purposes beyond those required to perform his job

responsibilities for DAT; downloading and transferring confidential information to an electronic

repository not authorized by DAT; recording without knowledge or consent confidential messages

and conversations referencing and related to confidential company information; failing to adhere

to company policies addressing the handling of DAT confidential information; and disseminating

and disclosing confidential information to third parties and threatening future distribution.

65.     As a result of the actions described above, Mr. Celoria is in breach of the

Confidentiality Agreement due to at least his: misappropriation of DAT's trade secret and

confidential information; failure to return Company property; accessing DAT confidential

information and trade secrets of DAT (including information that was not needed to perform his

job related duties), storing that information on personal devices and third party devices outside the

company's secure network (e.g., cloud storage providers), and sharing that information with at

least one third party individual; and failing to protect DAT's confidential information and trade

secrets and threatening to disseminate them.

66.     DAT will suffer immediate, immeasurable, and irreparable harm to its customer

relationships, supplier relationships, trade secrets, and goodwill, unless Mr. Celoria and those

collaborating or acting in concert with him are enjoined from continuing to violate the

Confidentiality Agreement, including the provisions on maintaining the secrecy of DAT's

confidential information, prohibiting the dissemination of that information to third parties, and

using the information for purposes not authorized by DAT.

67.    As expressly agreed by Mr. Celoria in the Agreement, DAT has no adequate

remedy at law and will suffer irreparable harm by the breach of the Agreement.

68.    As a result of Mr. Celoria's breaches, DAT has and continues to sustain damages

in an amount to be proven at trial.

### COUNT II: VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836, *et seq.*
**Against Defendant Celoria and Defendants Does 1-10**

69.    DAT incorporates by references the allegations in the preceding paragraphs as if

set forth fully herein.

70.    DAT has a variety of trade secrets including, but not limited to, technical and non-

technical data, formulas, source code, sensitive rate information, security protocols, protocol

criticality analyses, network security architecture, data encryption implementations, passwords,

keys, or other security credentials, data storage locations, compliance standards and security

posture, compilations, programs, plans, devices, methods, techniques, financial data and plans,

product plans, and customer and competitor information and data. Mr. Celoria and Does 1-10

acknowledged this information is to be protected trade secrets in the Confidentiality Agreement

they executed upon the commencement of their employment with DAT, as well as by their written

agreements to abide by all of the other DAT policies provided to him upon the commencement of

his employment..

71.    DAT takes reasonable measures to protect the confidentiality of its trade secrets

and other proprietary information.  As explained above, DAT requires employees to sign a

Confidentiality Agreement (and relevant addenda).  Employees are also required to review and acknowledge numerous polices, handbooks, and procedures that set forth additional information on security policies that all employees are instructed about and are required to follow.  As explained above, DAT further protects the confidentiality of its trade secrets and other proprietary information through various data, network, and device protocols and tools such as data loss prevention tools, monitoring programs, data protection programs, email protection programs, document marking and restriction on digital repositories and documents.

72.     Mr, Celoria and Does 1-10 acknowledged they would have access to DAT's confidential information and trade secrets in the Confidentiality Agreement they signed with DAT. Moreover, as set forth in the various policy guides Mr. Celoria and Does 1-10 acknowledged receiving in writing, they also recognized and acknowledged that they had access to multiple specific types of confidential information and trade secrets and agreed to adhere to their obligations to protect that information from external publication or access.

73.     The past misappropriation and threatened future disclosure of the specific security protocols used and how they are implemented in DAT's security framework, security checklists, and recorded conversations discussing sensitive proprietary information constitute legitimate DAT trade secrets justifying the granting of temporary and preliminary injunctive relief.  This information derives independent economic value for DAT from the fact that this information is not generally known outside of the company.

74.     Mr. Celoria's and Does 1-10's past misappropriation and threatened future disclosure of the specific security protocols used and how they are implemented in DAT's security framework, security checklists, and recorded conversations discussing sensitive proprietary

information if not enjoined would cause significant and irreparable harm to DAT by creating a serious and immediate threat to the integrity of DAT's security systems by exposing highly sensitive information that, in the wrong hands, could be used to bypass DAT's security systems and interfere with DAT's ability to operate its business.

75.     Mr. Celoria and Does 1-10 repeatedly acknowledged their obligations not to use this trade secret and confidential information for purposes outside those required for performing his job obligations, and that they were not permitted to download or otherwise use or access such data for personal use.   Nonetheless, Mr. Celoria and Does 1-10 knowingly engaged in the intentional and unlawful conduct described above.

76.     Mr. Celoria and Does 1-10 have already provided at least one third party with access to DAT's trade secret information and have intimated that they intend to further disseminate the trade secrets and confidential information unlawfully taken from DAT.

77.     The harm to DAT if Mr. Celoria and Does 1-10 are not enjoined from further use and or dissemination of the information wholly outweighs the harm to any legitimate interest of Mr. Celoria.  Mr. Celoria has no legitimate need or interest for any DAT trade secret information outside his employment and no need to disseminate such information.  The cost of Mr. Celoria's and Does 1-10's compliance is essentially non-existent compared to the millions of dollars the trade secrets represent for DAT's ongoing operations.   Accordingly, DAT seeks immediate injunctive relief to retrieve the stolen trade secret information and to prevent Mr. Celoria, Does 1-10, and those collaborating or working with them from disseminating that information and from committing any additional violations.

78.    DAT also seeks damages for any loss or unjust enrichment caused by the misappropriation, including attorneys' fees and exemplary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff DAT respectfully requests this Court award:

A.    Injunctive relief, first in the manner of a temporary restraining order, then as a preliminary injunction, and finally as a permanent injunction, ordering that Defendant Celoria, Does 1-10, and any other person collaborating or acting in concert with them are:

- Restrained and enjoined from accessing, using, disclosing, sharing, or making available to any person or entity other than Plaintiff, any of Plaintiff's confidential, proprietary, or trade secret documents, data, or information;

- Restrained and enjoined from sending, transmitting, or otherwise transferring DAT's confidential, proprietary, or trade secret information to any other person or entity;

- Restrained and enjoined from altering, destroying, or disposing of any evidence including documents, communications, information, or other tangible or intangible things, in any form, relating to (i) DAT, (ii) the claims asserted by DAT in this action, or (iii) Defendant's acquisition, use, transfer, or disposal of DAT's property; and

- Required to account for (through expedited discovery) and return to Plaintiff any and all of Plaintiff's property, including its confidential, proprietary, and trade secret information, wherever it resides or is stored, and with a full accounting to as to whom any such property has been disseminated.

B.    Judgment against Mr. Celoria for breach of the Confidentiality Agreement;

C.    Judgment against Mr. Celoria and Does 1-10 for violation of the Defend Trade Secrets Act;

D.    An award of actual, incidental, compensatory, and consequential damages for Mr. Celoria's and Does 1-10's breaches of contract and violation of the Defend Trade Secrets Act, as

well as an award of exemplary damages for violating the Defend Trade Secrets Act, in an amount
to be proven at trial,

E.    Disgorgement of any funds gained from Mr. Celoria's illegal activity;

F.    Costs and attorneys' fees for both the Breach of Contract claim pursuant to the
terms of the Confidentiality Agreement and for the breach of the Defend Trade Secrets Act
pursuant to 18 U.S.C. § 1836;

G.    Pre- and post-judgement interest as provided by law; and

H.    Such other and further relief to which DAT may be justly entitled.

## <u>DEMAND FOR JURY TRIAL</u>

DAT demands a trial by jury on all claims triable.

Dated:  September 4, 2025

/s/ Ronald S. Lemieux
**Ronald S. Lemieux**
Squire Patton Boggs (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA 94304
Telephone: +1 650 856 6500
FAX: +1 650 843 8777
Email: ronald.lemieux@squirepb.com

**Kristin Lieske Bryan**
**Steven M. Auvil** (application forthcoming)
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone:  +1 216 479 8500
FAX:  +1 216 479 8780
Email: kristin.bryan@squirepb.com
Email: steven.auvil@squirepb.com

***Keith Bradley***
Squire Patton Boggs (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
Telephone: +1 303 894 6156
FAX: +1 303 894 9239
Email: keith.bradley@squirepb.com

Attorneys for Plaintiff DAT Solutions, LLC