IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:25-CV-02766

DAT SOLUTIONS, LLC,

                Plaintiff,

v.

JOHN CELORIA, and DOES 1-10,

                Defendants.

---

**PLAINTIFF DAT SOLUTIONS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER GRANTING EXPEDITED DISCOVERY**

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 3

    A.   DAT Develops World Class Freight Tracking Technology Supported by Highly
         Confidential and Trade Secret Security Protocols. ........................................... 3

    B.   DAT Protects Its Confidential Information and Trade Secrets........................... 3

    C.   Celoria Joined DAT and Agreed to Protect DAT's Confidential and Trade Secret
         Information. ....................................................................................................... 5

    D.   Celoria Manifests Conduct Contrary To DAT's Culture, Policies, and Protocols. ........... 6

    E.   Celoria Reveals Stolen Trade Secrets and Confidential Information. ................ 7

    F.   Celoria Creates the Impression That He Will Disseminate DAT's Confidential
         Information and Trade Secrets........................................................................... 9

III.    LEGAL STANDARD............................................................................................. 11

IV.     ARGUMENT....................................................................................................... 12

    A.   DAT Is Likely To Succeed On The Merits Of Its Claims Against Celoria...................... 12

        1.   DAT Is Likely To Succeed On Proving Its Breach Of Contract Claim...................... 12

        2.   DAT Is Likely To Succeed On The Merits Of Its DTSA Claim. ....................... 14

    B.   DAT Will Suffer Irreparable Harm Without An Injunction. ............................. 19

    C.   The Balance of Equities and Public Interest Favor Granting a TRO............................. 20

    D.   The Court Should Permit Narrow Discovery On An Expedited Basis............................ 21

V.      CONCLUSION..................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

# **CASES**

*Arctic Energy Servs., LLC v. Neal*,
   No. 18-CV-00108-PAB-KLM, 2018 WL 1010939 (D. Colo. Feb. 22, 2018)..................14, 16

*Awad v. Ziriax*,
   670 F.3d 1111 (10th Cir. 2012) ...............................................................................................20

*Baker Hughes Oilfield Operations, Inc. v. Beard*,
   No. 15-CV-02231-PAB-KMT, 2016 WL 471390 (D. Colo. Feb. 8, 2016).......................12, 13

*Bankers Life & Cas. Co. v. Laycock*,
   No. 18-cv-459, 2018 WL 1046789 (D. Colo. Feb. 26, 2018)...................................................19

*Comet Techs. U.S. of Am. Inc. v. Beuerman*,
   No. 18-CV-01441-LHK, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ...............................22

*Complete Fire Prot., Inc. v. Kolman*,
   No. 19-CV-1134-WJM-STV, 2019 WL 1755280 (D. Colo. Apr. 19, 2019)....................19, 20

*EIS Ultimate Holding, LP v. Huset*,
   No. 23-CV-02324-GPG-MDB, 2024 WL 4472008 (D. Colo. Sept. 19, 2024) ................17, 19

*Exec. Consulting Grp., LLC v. Baggot*,
   No. 18-cv-231, 2018 WL 1942762 (D. Colo. April 25, 2018) .................................................16

*Gen. Elec. Co. v. Uptake Techs., Inc.*,
   394 F.Supp.3d 815 (N.D. Ill. 2019) ........................................................................................15

*Henry Schein, Inc. v. Cook*,
   191 F.Supp.3d 1072 (N.D. Cal. 2016) .....................................................................................20

*Mentor Worldwide LLC v. Craigo*,
   No. 12-cv-00776-REB-MJW, 2012 WL 1439498 (D. Colo. Apr. 26, 2012) .........................15

*NRC Broad. Inc. v. Cool Radio, LLC*,
   No. 09-CV-02076-REB, 2009 WL 2965279 (D. Colo. Sept. 14, 2009)...................................11

*Panorama Consulting Sols., LLC v. Armitage*,
   No. 17-CV-01400-RM, 2017 WL 2929549 (D. Colo. July 10, 2017).....................................17

*Pod-Ners, LLC v. N. Feed & Bean of Lucerne Ltd. Liab. Co.*,
204 F.R.D. 675 (D. Colo. 2002) ............................................21

*W. Distrib. Co. v. Diodosio*,
841 P.2d 1053 (Colo. 1992) ............................................12

*Winnebago Tribe of Neb. v. Stovall*,
341 F.3d 1202 (10th Cir.2002) ............................................22

*Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*,
No. 07-cv-2324, 2008 WL 2185882 (D. Colo. May 23, 2008) ............................................19

## <u>STATUTES</u>

18 U.S.C. § 1836(b) ............................................11, 14

18 U.S.C. § 1839............................................14, 18

## <u>OTHER AUTHORITIES</u>

Fed. R. Civ. P. 26............................................21

Fed. R. Civ. P. 65............................................22

Please take Notice that pursuant to Federal Rule of Civil Procedure 65 and D.C.COLO.LCivR 65.1, Plaintiff DAT Solutions, LLC ("DAT"), by and through its counsel of record, hereby moves this Court to enter a Temporary Restraining Order, Order to Show Cause Re Preliminary Injunction, and Order Granting Expedited Discovery against Defendant John Celoria ("Celoria"). This Motion is based on the Memorandum of Points and Authorities included below, the Declarations in Support filed herewith, and such other materials as the Court may consider just and appropriate.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Defendant Celoria has intentionally misappropriated DAT's highly sensitive and valuable information, including but not limited to, information concerning its network infrastructure, protocols, vulnerability analyses, passwords and security keys. Celoria has intimated that he intends to further disseminate this highly confidential and trade secret information under the delusion that he must do so to "save America" from foreign agents. Celoria's ill-informed and unlawful crusade, however, violates not only federal law (the Defend Trade Secrets Act or DTSA) but also the express terms of his agreements with DAT and explicit company policies. If Celoria delivers on his threat, such a disclosure would cause DAT immediate and irreparable harm as it would expose DAT to potential cyberattacks and the risk of interference with its core business operations. Celoria must be enjoined to avoid this outcome.

During his two-year tenure at DAT, Celoria became obsessed with the security protocols that DAT has put in place to protect the data, source code, and customer information that is critical to DAT's freight-matching services and platforms it provides to customers. Celoria's obsession

recently escalated, culminating in an internal DAT investigation that revealed Celoria had secretly downloaded highly confidential and trade secret information of DAT and disseminated it to at least one third party, with the apparent intent to distribute it to a far wider audience. This information includes, but is not limited to, the design of DAT's security infrastructure and protocols, DAT's compliance checklists, the physical location of DAT's datacenters and servers, unauthorized and unconsented to recordings of employee conversations, screenshots relating to DAT's security practices, and a customer list. If this information is publicly disseminated as threatened by Celoria, it would cause great harm to DAT's business and have ripple effects for its customers.

Celoria is well aware that his obligations to DAT prevent him from taking the confidential information and trade secrets from DAT. His threat to disseminate this information to the public is not only a further breach of his confidentiality obligations and trade secret misappropriation, but a shocking departure from DAT's collaborative and collegial workplace culture.

Despite DAT's repeated efforts to amicably resolve this matter with Celoria, Celoria has refused to return DAT's sensitive material and refused to avoid further dissemination of the material. Faced with no other alternative, DAT seeks this Court's immediate assistance in enjoining Celoria and those collaborating or working in concert with him from further disclosure of mission-critical security information to avoid the irreparable harm that will otherwise befall DAT.

II.    **STATEMENT OF FACTS**

A.    **DAT Develops World Class Freight Tracking Technology Supported by Highly Confidential and Trade Secret Security Protocols.**

DAT's product platforms provide shipping solutions throughout North America, such as an on-demand freight marketplace and end-to-end freight management solutions. Declaration of Brian Gill ("Gill Decl.") ¶ 4. These platforms have taken years of research and development, countless hours of skilled technical labor, and large investments of capital. *Id.*

DAT's commercial platforms require the creation, implementation and ongoing maintenance of a security framework that contains numerous highly confidential protocols and controls to ensure the integrity and security of its commercially sensitive and highly valuable data. Gill Decl. ¶ 6. The internal structure of DAT's security framework supporting its various platforms, the data DAT collects for implementing, operating, and improving its platforms, the information regarding its customers, and its competitive intelligence are each categories of valuable trade secrets and fundamental to the successful operation of DAT's business. *Id.* DAT's security protocols and their specific configurations provide critical protections for DAT's internal operations and data against outside cyber threats. The implemented protocols are the result of thousands of personnel hours and millions of dollars invested by DAT and its affiliates over a substantial period of time. Gill Decl. ¶ 8.

B.    **DAT Protects Its Confidential Information and Trade Secrets.**

To protect DAT from the misappropriation or unauthorized disclosure of highly sensitive information, including DAT's trade secrets and confidential information, DAT has adopted multiple layers of secrecy measures to safeguard that information.

*First*, DAT requires all employees upon their hiring to review and sign a confidentiality agreement just like the Confidentiality Agreement Mr. Celoria signed.  Declaration of Jana Galbraith ("Galbraith Decl.") ¶ 4.  Under the Confidentiality Agreement, employees agree not to engage in any unauthorized use, transmission, copying, or disclosure of DAT's confidential information.  Galbraith Decl. ¶ 5 & Ex. A.  Employees may also be required to sign additional addenda to the Confidentiality Agreement addressing specific access to certain trade secret and confidential information as required by their individual roles at the Company.  *See id.* ¶ 12. Employees are provided—and must acknowledge—receipt of other relevant policies addressing the use and treatment of confidential information and trade secrets, and the harm caused by any misappropriation or unauthorized disclosure of highly sensitive information. *Id.* ¶ 6.  As explained in detail in the supporting declarations, those policies include DAT's: **(1)** Rules of Conduct; **(2)** Acceptable Use Policy; **(3)** Information Security Policy; and **(4)** Management of Potential Conflicts of Interest Policy.  *Id.* ¶ 6 & Exs. B–E.

*Second*, in addition to the above-referenced policies, DAT also implements other protocols designed as reasonable measures to protect and safeguard its trade secret and confidential information, including but not limited to **(1)** Data Loss Prevention Tools; **(2)** monitoring programs; **(3)** cloud based data and email protections; and **(4)** restrictions on the ability to access certain documents and systems based on those required for specific job responsibilities.  Declaration of Becky Fricker ("Fricker Decl.") ¶ 5.  Moreover, upon hiring, all DAT employees are also required to undergo training courses on the policies and must update that training annually.  Galbraith Decl. ¶ 7.

**C.    Celoria Joined DAT and Agreed to Protect DAT's Confidential and Trade Secret Information.**

On April 21, 2023, Celoria joined DAT as a fully remote Senior DevOps Engineer. Galbraith Decl. ¶ 8.  As a Senior DevOps Engineer, Celoria's primary responsibilities included working on and improving DAT's Gitlab automation/pipelines, but not on DAT's security protocols or policies.  Gill Decl. ¶¶ 11–12.  As part of Celoria's onboarding with DAT, he agreed to review and acknowledge additional agreements and policies, many of which were targeted at ensuring he understood the nature of the trade secrets and confidential information to which he would have access to and the obligations he had to properly handle and safeguard such materials. Galbraith Decl. ¶ 10 & Ex. G.

Celoria signed the Confidentiality Agreement, which sets forth the various obligations Celoria acknowledged and agreed to.  Galbraith Decl. ¶ 10 & Ex. A.  In doing so, he acknowledged that he would be provided with "access to Confidential Information (including trade secrets) related to my position."  Galbraith Decl. Ex. A, ¶ 1.  Celoria also recognized the significant and serious obligations and restrictions he was required to follow in receiving such confidential and trade secrets information.  *Id.*  Ex. A, ¶¶ 2–3.  Celoria promised to use the Confidential Information "only in the performance of my duties, to hold such information in confidence and trust, and not to engage in any unauthorized use, transmission, copying, or disclosure of such information during my employment and for so long thereafter as such information qualifies as Confidential Information."  *Id.*. Ex. A, ¶ 2.  Celoria also agreed not to transfer documents to personal devices or use any documents for non-work purposes.  *Id.*  He further acknowledged that such information had economic value for DAT and that he was therefore required to protect it.  *Id.* Ex. A, ¶ 2; *see also id.* ¶ 6.

### D.    Celoria Manifests Conduct Contrary To DAT's Culture, Policies, and Protocols.

After working at DAT for a time, Celoria began to exhibit an apparent obsession with company security and protocols even though that was outside the scope of his position. *See* Gill Decl. ¶¶ 14–15. Specifically, Celoria began to exhibit aggressive and unwarranted behavior arising out of his ill-informed perceptions of DAT's network security framework and controls. *Id.* ¶¶ 15–18. Celoria also appeared to exhibit signs of significant stress during his tenure with DAT. *Id.* ¶ 21; Galbraith Decl ¶ 32. In his short time with the company, Celoria took two sabbaticals or long-term leaves of absence. Galbraith Decl. ¶¶ 15, 34–38. Celoria eventually returned from his scheduled leave, but in late August 2025 continued to exhibit unusual, elevated concerns with hypothetical and attenuated security threats to DAT. Galbraith Decl. ¶¶ 16–20, 22–24, 29–30. He repeatedly voiced unsubstantiated and ill-informed concerns regarding perceived foreign security risks and made baseless accusations about the competency and loyalty of DAT's leadership. *Id.* In an effort to hear out Celoria's concerns, DAT executives met with Celoria on multiple occasions, each of which resulted in Celoria making unwarranted and unsupported assertions regarding the security threats he perceived DAT to be vulnerable to. *Id.*; Gill Decl. ¶¶ 19, 21

These meetings culminated in an August 27, 2025, meeting with Celoria and various DAT executives. Galbraith Decl. ¶¶ 27–29; Gill Decl. ¶¶ 20–21. During that meeting, Celoria again expressed to the group his opinion that DAT had security issues that were a threat to national safety and that if these issues were not addressed, "people would die." Galbraith Decl. ¶ 29; Gill Decl. ¶ 21. Celoria stated that he believed he was protecting and saving American lives by raising these concerns. Gill Decl. ¶ 21. DAT discovered that Celoria had been recording roughly 100 conferences and calls that he had with DAT personnel regarding security matters, without the

- 6 -

knowledge or consent of the individuals involved.  *Id.* ¶ 27.  Celoria further revealed that he had

taken numerous screen-captures of Slack conversations between DAT employees and that he

claimed to have evidence about his security concerns.  *Id.* ¶ 27.  Throughout the August 27, 2025

meeting Celoria repeatedly theorized about hypothetical scenarios where his perceived security

vulnerabilities could lead to national security threats including mass casualties. Celoria was asked

to send DAT executives examples of his perceived security vulnerabilities and his "evidence."

Gill Decl. ¶ 22; Galbraith Decl. ¶ 30.

**E.    Celoria Reveals Stolen Trade Secrets and Confidential Information.**

In response to DAT's request for information, Celoria emailed a zip file to the DAT

executives that contained documents related to DAT's network security framework and controls,

at least one customer list, screen captures, video recordings, and a spreadsheet documenting his

findings and indexing the purported support for his concerns. Gill Decl. ¶ 23.  The zip file was

alarming because it included highly sensitive confidential and trade secret information about DAT

that Celoria should not have had in his possession.  Gill Decl. ¶¶ 24, 37.  This included information

related to DAT's network security framework and controls, as well as protocols, checklists,

compliance efforts, and unauthorized recordings of meetings regarding these and other

confidential topics.  *Id.* ¶¶ 23–25.  If such highly sensitive data fell into the wrong hands, it could

potentially enable a skilled hacker to access DAT's systems and steal or misappropriate DAT's

confidential and proprietary information.  *Id.* ¶ 30.

Celoria's August 27, 2025, email and its contents confirmed that Celoria was an internal

security threat to the company and that he had already engaged in the unauthorized access and

removal of confidential and proprietary DAT information.  Gill Decl. ¶ 26; Fricker Decl. ¶ 11.

Thereafter, DAT's Director of Information Security was tasked with further investigating and recovering the information contained on Celoria's work laptop. Fricker Decl. ¶¶ 7–9. DAT's Information Security team was able to remotely access Celoria's DAT-issued work laptop and conduct a remote forensic scan. *Id.* ¶ 11. Although the investigation is ongoing, the Information Security team identified more than 3GB (three giga-bytes) of data taken from Celoria's work laptop that he improperly possessed, including: ***(i)*** numerous documents related to DAT's security controls; ***(ii)*** materials evaluating the migration status of DAT's active security controls to the recommended network security controls provided by DAT's parent company;[1] ***(iii)*** approximately one-hundred video recordings of conversations with DAT personnel that were recorded without the participants' knowledge or consent; and ***(iv)*** numerous screens captures of private Slack conversations. Fricker Decl. ¶¶ 11–19; Gill Decl. ¶ 31. Many of the documents, recordings, and screen captures related to DAT's network security framework and controls are of particularly grave concern because such documents could be used as a road map to identify potential security vulnerabilities in DAT's network. These vulnerabilities, in turn, could be utilized to access other valuable highly confidential security and trade secrets. Gill Decl. ¶¶ 9, 30.

Celoria downloaded these materials even though they were not necessary for him to do his job at DAT. Gill Decl. ¶¶ 36–37. As a result of the investigation, DAT has reason to believe that Celoria downloaded these recording and data to his own personal devices, rather than on a company-issued device. Fricker Decl. ¶ 32. DAT also understands that Celoria likely copied confidential information onto personal thumb drives or other portable storage devices. *Id.*

---

[1] DAT is a subsidiary of Roper Industries, Inc. Roper provides its subsidiaries a standard network security control framework that its subsidiaries are to use as a model network security framework. Fricker Decl. ¶ 4 n.1.

**F.    Celoria Creates the Impression That He Will Disseminate DAT's Confidential Information and Trade Secrets.**

Through a forensic scan of Celoria's laptop, DAT uncovered a private wiki[2] that was hosted on a Docker container[3] on Celoria's DAT-issued laptop.  Fricker Decl. ¶ 20.  DAT understands that Celoria used the private wiki for uploading, storing, tracking, and cataloging the documents, screen captures, and recordings containing confidential information.  Fricker Decl. ¶¶ 20–21 & n.7.  The DAT Information Security team also uncovered that the private wiki was accessed by at least one person other than Celoria himself, and not affiliated with DAT.  Fricker Decl. ¶¶ 21–22.  The severity of this exfiltration cannot be overstated, as DAT's confidential information and trade secrets now face a significant threat of additional and irreparable disclosure.  Indeed, Celoria made several comments to DAT personnel during a discussion on August 27, 2025 that created the impression that he would publicly release the information in his possession.  Gill Decl. ¶ 40.  Further, as described above, Celoria has already made at least one unauthorized disclosure of DAT's confidential information and trade secrets in violation of his confidentiality obligations.  Gill Decl. ¶¶ 27, 29.

DAT's Information Security team also concluded that Celoria used his elevated Amazon Web Services ("AWS") credentials to bypass security protocols and access DAT's AWS environment and developer environment/tools to take screen captures of configuration settings and security posture management.    Fricker Decl. ¶ 25.    In doing so and then exfiltrating the

---

[2] A private wiki is a website that is hosted on an external server or cloud platform that includes controls on the individuals that my access the website.  Fricker Decl. ¶ 20 n.7.

[3] Docker is a web development tool that allows users to create portable web environments for building, testing, and running web applications locally.  Fricker Decl. ¶ 20 n.8.

information, Celoria violated his confidentiality obligations and DAT policies.  *See* Galbraith Decl. Ex. A, ¶ 2.[4]

The investigation into Celoria's actions also unearthed his personal blog, which includes a blog post from April 10, 2025, titled "How to get Auditable Data."  Fricker Decl. ¶ 30 & Ex. A. This post provides step-by-step instructions to guide the reader through accessing and removing company information without getting caught and other information detailed in the attached declarations, suggesting Celoria intends to continue with his unauthorized behavior.  Fricker Decl. ¶¶ 30–31 & Ex. A.  The blog post also reports that Celoria purchased "a dozen 32GB thumb drives, and a new yubikey[5]" for storing large amounts of data.  Fricker Decl. ¶ 32 & Ex. A.  This suggests that Celoria likely has accessed and unlawfully removed significantly more than the 3GB of data identified through the remote inspection of Celoria's work-issued laptop.  *See id.*

### G.  Celoria Fails to Confirm That He Will Abide By His Obligations To Protect And Not Misuse DAT's Trade Secrets and Confidential Information.

On August 28, 2025, Celoria had a meeting with DAT's Chief People Officer, during which Celoria sought to be placed on short term leave.  Galbraith Decl. ¶¶ 32–35.  The next day, Celoria was informed that DAT leadership had approved his requested leave and supplemental salary payments as long as he continued to comply with his obligations to DAT.  *Id.* ¶¶ 36–38.  DAT then locked down Celoria's laptop and he was no longer granted access to DAT's systems.  *Id.* ¶ 38.

---

[4] The investigation further revealed that Celoria misused his elevated AWS credential to access the network control framework, an unauthorized area that Celoria was not authorized to access. Fricker Decl. ¶ 26.

[5] Yubikey is a physical form of two factor authentication that can be used to encrypt files and require an input of the yubikey into a USB drive on the machine as an authentication device rather than receiving a code.  Fricker Decl. ¶ 32 n.9.

DAT personnel also reminded Celoria of his confidentiality obligations that he signed during his employee intake, and that since there was an ongoing investigation into his security concerns, he should not speak to any third parties about his concerns other than government agencies. *Id.* ¶¶ 40–41. DAT also requested that Celoria physically return his laptop. *Id.* ¶ 42. DAT later received correspondence from Celoria indicating that he was returning the DAT laptop. Galbraith Decl. ¶ 44

On September 3, 2025, Craig Womack, Roper's Vice President and Chief Compliance Officer, contacted Celoria in an effort to amicably retrieve all of the information and materials that Celoria had improperly accessed and removed from DAT's possession and control. Declaration of Craig Womack ("Womack Decl.") ¶¶ 1, 5. Celoria refused to provide the straight-forward assurances requested by Mr. Womack to: *(i)* avoid any further dissemination of the stolen materials and *(ii)* return all copies of the information and documents taken. *Id.* ¶ 6. Counsel for DAT then sent Celoria a cease-and-desist letter with specific demands that had to be satisfied to avoid immediate litigation and further notified him that DAT would seek a temporary restraining order and preliminary injunction should Celoria refuse. Declaration of Steven Auvil ("Auvil Decl.") ¶¶ 3–4 & Ex. A. Celoria was also specifically advised that any further dissemination or use of DAT's trade secrets or confidential information would significantly and irreparably harm DAT. *Id.* ¶ 5. Celoria, however, has failed to respond to the request for his written confirmation that he will abide by his obligations. Auvil Decl. ¶ 6.

## III.    <u>LEGAL STANDARD</u>

A temporary restraining order preserves the status quo and prevents irreparable harm until a hearing can be held on a preliminary injunction motion. The standard for issuing a temporary

restraining order is the same standard for issuing a preliminary injunction. *NRC Broad. Inc. v. Cool Radio, LLC,* No. 09-CV-02076-REB, 2009 WL 2965279, at *1 (D. Colo. Sept. 14, 2009). In both cases, the movant must show "(1) a substantial likelihood that the movant eventually will prevail on the merits; (2) that the movant will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Id.; see also* 18 U.S.C. § 1836(b)(3)(A) (court may issue injunctive relief to prevent actual or threatened trade secret misappropriation). Celoria also consented to injunctive relief in the Confidentiality Agreement he signed. *See* Galbraith Decl. Ex. A, ¶ 6.

## IV.    ARGUMENT

### A.    DAT Is Likely To Succeed On The Merits Of Its Claims Against Celoria.

#### 1.    DAT Is Likely To Succeed On Proving Its Breach Of Contract Claim.

To prove its breach of contract claim, DAT must show: **(1)** the parties had an enforceable contract; **(2)** DAT performed as required by the contract (or was justified in not performing); **(3)** Celoria failed to perform the contract; and **(4)** damages resulted to DAT. *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992). All four requirements are readily satisfied here:

***First***, the Confidentiality Agreement is a valid and enforceable contract under Colorado law. *See, e.g., Baker Hughes Oilfield Operations, Inc. v. Beard,* No. 15-CV-02231-PAB-KMT, 2016 WL 471390, at *1 (D. Colo. Feb. 8, 2016) (granting injunctive relief based on alleged violations of a valid employee agreement).

***Second***, DAT performed under the contract, employing Celoria for over two years and paying him wages as required by the Confidentiality Agreement. *See* Galbraith Decl. Ex. A at 1. Celoria cannot contend otherwise.

***Third***, Celoria has indisputably failed to perform under the contract. *See* Galbraith Decl. Ex. A, ¶ 2. Notwithstanding the clear obligations related to the treatment of DAT confidential information and trade secrets, Celoria has repeatedly violated and continues to violate that Agreement in numerous ways. *See, e.g.*, Gill Decl. ¶¶ 24, 33; Fricker Decl. ¶ 11 (detailing efforts to improperly download documents to personal devices); Gill Decl ¶ 27; Fricker Decl. ¶ 16 (recording sensitive business conversations without consent); Gill Decl ¶ 27; Fricker Decl. ¶ 16 (taking screen captures of conversations discussing proprietary information for non-job related purposes); Fricker Decl. ¶¶ 25–27 (improperly using credentials to gain access to documents, conscripting a colleague to help in those efforts); Gill Decl. ¶¶ 27–29; Fricker Decl. ¶¶ 20–21 (uploading documents to external wiki page and providing access to third party). In doing so, Celoria also violated company policies addressing the handling of DAT confidential information and trade secrets. *See* Fricker Decl. ¶¶ 11–32; Gill Decl. ¶¶ 23–39; *see also* Galbraith Decl. ¶ 6 (discussing policies). He also failed to return property or confirm his obligations to protect DAT's confidential information under the Agreement. Womack Decl. ¶ 6.

***Fourth***, DAT is suffering and will continue to suffer damages from Celoria's breach. Celoria has removed DAT confidential information to private storage devices and has threatened to publicly disseminate DAT's confidential information and trade secrets, including security-related information that would expose it to hacking. DAT will suffer immediate, immeasurable, and irreparable harm to its customer relationships, trade secrets, goodwill, and operations unless

- 13 -

Celoria is enjoined from continuing to violate the Confidentiality Agreement.  *See, e.g.*, *Baker Hughes Oilfield Operations, Inc. v. Beard,* 2016 WL 471390, *1 (D. Colo. Feb. 8, 2016) (granting motion for preliminary injunction and finding a likelihood of success on the merits in breach of contract claim where employee forwarded 50 emails to his personal email the day he resigned).

### 2.    DAT Is Likely To Succeed On The Merits Of Its DTSA Claim.

DAT is also likely to succeed on the merits of its federal trade secret misappropriation claim.  A plaintiff asserting a claim for misappropriation of trade secrets under the DTSA must establish: "(1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Arctic Energy Servs., LLC v. Neal,* No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018); 18 U.S.C. § 1836(b)(1).  The DTSA specifically allows for injunctive relief to maintain the confidentiality of trade secrets in the face of actual or threatened misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A).  DAT satisfies all of these requirements.

### a.    The Information, Documents, and Data Stolen By Celoria Qualify As Trade Secrets.

The DTSA defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to," or ascertainable by, another person.  18 U.S.C. § 1839(3).  In this case, Celoria has taken a vast

amount of information concerning DAT's network security framework and controls and other

trade secrets  Gill Decl. ¶¶ 23–25, 27, 31; Fricker Decl. ¶¶ 11–19.

Specific examples of these secrets include:

- A document outlining DAT's network security architecture and classifying the applications within the architecture based on how critical the application was to DAT's network security architecture;

- A captured image of DAT's Amazon Web Service[6] ("AWS") database encryption settings;

- A captured image of DAT's passwords, API keys, or credentials that are stored in DAT's proprietary code;

- AWS security posture scoring which reveals DAT's security stance identifies areas in DAT's network that are potentially more vulnerable than others; and

- A document identifying the exact physical address of DAT's servers, including  its Datacenter, which could be used to access DAT's servers and cause significant harm to the company.

Gill Decl. ¶¶ 23–25, 27, 31; Fricker Decl. ¶¶ 12–19.  All of these examples qualify as trade secrets

under the DTSA.

*First*, the information is kept secret by DAT.  *See, e.g.*, Fricker Decl. ¶ 5.  Indeed, this

information is only accessible on a need to know basis.  Fricker Decl. ¶ 5(f) and (g).

*Second*, the secret information at issue derives economic value from not being readily

known to or ascertainable by another person.  The categories of information above, and others

misappropriated by Celoria, were developed and maintained through decades of DAT's

employees' skills, judgment and labor, as well as DAT's significant financial investment.  Gill

Decl. ¶ 4.  As set forth in the accompanying declarations, this information is critical to DAT's

---

[6] AWS is a cloud computing platform provided by Amazon that offers a wide range of digital services including digital infrastructure technologies infrastructure. Fricker Decl. ¶ 12 n.4.

business operations and knowledge of this information would give competitors the ability to target customers or less robust areas within DATs' security framework.  Fricker Decl. ¶ 14.  Further, understanding DAT's security policies and protocols would allow threat actors to focus their efforts to exploit any potential weakness in DAT's security infrastructure.  *Id.*

DAT, therefore, realizes significant value from maintaining the secrecy of these documents and information, congruent with precedent from other courts in this District when confronted with similar circumstances.  *See, e.g.*, *Mentor Worldwide LLC v. Craigo,* No. 12-cv-00776-REB-MJW, 2012 WL 1439498, at *3 (D. Colo. Apr. 26, 2012) (explaining information about "sales histories, buying patterns, pricing arrangements, customer consignment arrangements, and customer preferences, likely are [] trade secrets."); *Exec. Consulting Grp., LLC v. Baggot,* No. 18-cv-231, 2018 WL 1942762, at *15-16 (D. Colo. April 25, 2018) (finding that list of active projects, and project proposals "unquestionably have independent economic value, particularly in the hands of a competitor"); *see also Gen. Elec. Co. v. Uptake Techs., Inc.,* 394 F.Supp.3d 815 (N.D. Ill. 2019) (holding that non-public information about developer's customer needs and preferences, pricing and margins, product, marketing, and long-term strategies, confidential bids to customers, confidential acquisition strategies and targets, and technology and software were protectable).

*Third,* DAT has taken "reasonable measures" to keep its trade secret in confidence. None of the information at issue is available to the public or readily ascertainable through proper means by any DAT competitors or those outside of DAT or its affiliated companies.  Fricker Decl. ¶ 5; Gill Decl. ¶¶ 6–7. DAT requires employees to sign confidentiality agreements and adhere to protocols and policies outlining the treatment of confidential material.  Galbraith Decl. ¶¶ 4, 6.

Further, DAT employs numerous electronic and physical safeguards to protect its trade secrets and proprietary information. *See* Fricker Decl. ¶¶ 5–6; Galbraith Decl. ¶¶ 6–7.

Courts have repeatedly held that such efforts constitute reasonable secrecy measures. For example, in *Arctic Energy Servs., LLC v. Neal*, the court observed that reasonable measures to maintain secrecy include "confidentiality warnings in company emails, employee nondisclosure agreements, restricted access to offices containing confidential information, and restricted access to confidential information on the company server." 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018). Similarly, the trade secret information Celoria misappropriated from DAT and threatened to publicly expose is the subject of reasonable secrecy measures under the DTSA.

**b.    Celoria Acquired, Used, and Disclosed DAT's Trade Secret Through Improper Means and Without Consent.**

Celoria secretly downloaded the above-referenced trade secrets and did so without DAT's authorization and in violation of the Confidentiality Agreement, DAT policies, and trade secret law. Fricker Decl. ¶¶ 11–32; Gill Decl. ¶¶ 23–39; *see also* Galbraith Decl. ¶ 6 (discussing policies). Celoria used his elevated AWS credentials to improperly bypass security protocols and access DAT's AWS environment and developer tools to take screen captures of configuration settings and security posture management. Fricker Decl. ¶ 25. Celoria used those same credentials to access the network control framework, which for him was an unauthorized area at DAT. *Id.* ¶ 26. Celoria misused that information by downloading the documents for purposes unrelated to his job responsibilities, by uploading the documents to his personal wiki page, and then disclosing the information to at least one other third party not affiliated with DAT. Fricker Decl. ¶ 21 And, based on Celoria's statements, DAT believes that Celoria intends to disclose the trade secret

information in his possession. Gill Decl. ¶ 40.  Courts have consistently granted injunctive relief
in similar situations, where a party unlawfully takes trade secret documents for personal use with
an intent to disclose that information or use it for unauthorized purposes.  For example, in *EIS
Ultimate Holding, LP v. Huset*, the court granted a request for injunctive relief under the DTSA
where the defendant unquestionably "downloaded [plaintiff] ESA's documents—including the 54
documents that ESA alleges are and/or contain its trade secrets."   No. 23-CV-02324-GPG-MDB,
2024 WL 4472008, at *16 (D. Colo. Sept. 19, 2024); *see also Panorama Consulting Sols., LLC v.
Armitage,* No. 17-CV-01400-RM, 2017 WL 2929549, at *3 (D. Colo. July 10, 2017) (converting
a TRO to a preliminary injunction where a defendant had emailed himself documents containing
a plaintiff's trade secrets).

### c.    Celoria Knew He Acquired the Trade Secrets by Improper Means.

Celoria also knew that he acquired the trade secrets through improper means.  *See* 18
U.S.C. § 1839(5)(A), (B)(ii)(I).  The DTSA defines "improper means" to "include[ ] theft, bribery,
misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage
through electronic or other means."  *Id.* § 1839(6)(A).  As summarized above, DAT uses various
protective measures to restrict access to its trade secrets and confidential information on an as-
needed basis, which Celoria acknowledged.  *See* Fricker Decl. ¶¶ 5–6.  Celoria agreed, by signing
the  Confidentiality  Agreement  and  acknowledging  various  company  policies,  that  he  was
obligated to keep DAT's proprietary information and trade secrets confidential, and his access and
use  of  such  information  was  limited  to  that  required  for  the  performance  of  his  duties.  *See*
Galbraith Decl. Ex. A–E, G.  Celoria initially took steps to cover up his unlawful actions, including
though surreptitious means.  Fricker Decl. ¶¶ 25–27, 30–32.  For example, Celoria recorded

roughly 100 conversations regarding sensitive materials and information without seeking the authorization or consent of those involved.  Gill Decl. ¶ 27; Fricker Decl. ¶ 16 .

For all of the aforementioned reasons, DAT is highly likely to succeed on the merits of its DTSA claim.

### B.     DAT Will Suffer Irreparable Harm Without An Injunction.

Celoria agreed that misuse of DAT's confidential information and trade secrets would cause irreparable harm to DAT.  *See* Galbraith Decl. Ex. A, ¶ 6.  It already has caused irreparable harm (*e.g.* through disclosure to at least one third party) and Celoria's refusal to provide assurances that he will not further disseminate the information again amplify the harm.  Indeed, the public disclosure of DAT's trade secrets will both create competitive harm to DAT and would expose its security systems to  external threat actors.  Gill Decl. ¶¶ 9, 24–25.  The consequences to DAT would be devastating and would cause irreparable harm to DAT's mission and operations.  Courts in the Tenth Circuit grant injunctive relief where, as here, an employee removes trade secrets from the company for purposes outside those needed for their employment roles.  *See, e.g., Bankers Life & Cas. Co. v. Laycock,* No. 18-cv-459, 2018 WL 1046789, at *4 (D. Colo. Feb. 26, 2018) (finding irreparable harm where defendants removed confidential information prior to leaving their employment); *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.,* No. 07-cv-2324, 2008 WL 2185882 (D. Colo. May 23, 2008) (granting preliminary injunction against former employee who "accessed at least twenty-six highly confidential and trade secret[s] . . and either saved them to an external source or emailed them to his and his wife's personal email accounts.")).  The same result should be reached in this case.

Further, the ongoing nature of Celoria's malicious campaign against DAT makes clear that DAT will suffer irreparable harm without the requested relief. Celoria has demonstrated his intent to further disclose sensitive information with an intent to harm DAT, its management, and its parent company by moving that information out of DAT's secure systems and into a private wiki that only he controls. Fricker Decl. ¶¶ 11, 20–22. Such continued threats further warrant injunctive relief. *See Complete Fire Prot., Inc. v. Kolman,* No. 19-CV-1134-WJM-STV, 2019 WL 1755280, at *2 (D. Colo. Apr. 19, 2019) (irreparable harm may arise if the defendant were not enjoined from "using or disseminating the trade secrets obtained" from the plaintiff or "engaging in business activities that compete" with the plaintiff); *EIS Ultimate Holding, LP v. Huset*, No. 23-CV-02324-GPG-MDB, 2024 WL 4472008, at *8 (D. Colo. Sept. 19, 2024) ("Based on Defendants' documented behavior—a pattern of using ESA's information to compete—as well as Defendants' apparent lack of credibility, the Court finds it likely that Defendants will use it to continue unlawfully competing with ESA if not enjoined.").

### C.    The Balance of Equities and Public Interest Favor Granting a TRO.

The balance of hardships also favors granting a temporary restraining order and injunctive relief here.. In balancing harms, courts consider whether the moving party's "threatened injury outweighs the injury the opposing party will suffer under the injunction." *Awad v. Ziriax,* 670 F.3d 1111, 1125 (10th Cir. 2012). As set forth above, DAT will suffer substantial irreparable harm absent an injunction. An injunction will impose no burden on Defendant Celoria who has no legitimate reason to use or disclose any of the DAT trade secret information he has stolen. Nor would an injunction prevent Celoria from working for another employer whether in this industry or outside it. In fact any injury claimed by Celoria must be "discounted by the fact that the

defendant[s] brought that injury upon [themselves]."  *Core Progression,* 2021 WL 1153892, at
*11.

The requested injunctive relief also is not adverse to the public interest.  Injunctive relief
serves the public interest when it requires a defendant to do "no more than abide by trade laws and
the obligations of contractual agreements signed with [his] employer."  *Henry Schein, Inc. v. Cook,*
191 F.Supp.3d 1072, 1078 (N.D. Cal. 2016).  Further, "it is in the public interest to protect trade
secrets, prevent unfair competition, and to enforce valid contracts."  *Kolman,* 2019 WL 1755280,
at *3 (granting a TRO for alleged misappropriation of trade secrets in violation of the DTSA).
That is precisely what the requested TRO would do here—require Celoria to refrain using, or
disseminating DAT's confidential information; to account for all such information through
expedited discovery; and to return that information to DAT.

### D.    The Court Should Permit Narrow Discovery On An Expedited Basis.

This Court has the authority to permit expedited discovery prior to a Rule 26(f) conference
upon a showing of good cause. *See* Fed. R. Civ. P. 26(d)(1); *Pod-Ners, LLC v. N. Feed & Bean of
Lucerne Ltd. Liab. Co.,* 204 F.R.D. 675, 676 (D. Colo. 2002) (expedited discovery is appropriate
in cases involving injunctive relief).

Here, expedited narrow discovery, consisting of a deposition of Celoria, a subpoena for
documents and evidentiary records of a third party service provider utilized by DAT that protects
DAT's endpoint users and monitors DAT's data, and a forensic examination of Celoria's personal
electronic devices and storage accounts, is necessary to account for and understand the nature and
extent of Celoria's misappropriation and efforts to hide such unlawful action, and to increase the
likelihood that DAT's information is returned to the Company and not further disseminated.   The

deposition is also necessary to understand the extent of Celoria's surreptitious activity, which suggests he may have taken other data and trade secrets (some of which has already been shared with third parties), and whether there has been a wider dissemination of the material than DAT is presently aware of. DAT continues its investigation but does not fully know the full extent Celoria's or disclosure of DAT's confidential and proprietary information to third parties.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, DAT respectfully submits that it has satisfied the requirements for the issuance of (1) a temporary restraining order to preserve the status quo pending a preliminary injunction hearing, (2) a preliminary injunction, and (3) an order allowing limited expedited discovery prior to the Rule 26 Conference. DAT respectfully requests that this Court enter the proposed temporary restraining order and, after any hearing, enter a preliminary injunction. Because Defendant Celoria will not suffer any undue harm if the requested relief is granted, DAT requests the Court find that a bond is unnecessary.[7]

---

[7] Under Federal Rule of Civil Procedure 65(c), district courts have "'wide discretion'" in determining whether to require security for injunctive relief. *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir.2002). Here, there is no realistic likelihood of harm to Celoria because he "was never entitled to disclose or use the information" he took. *Comet Techs. U.S. of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018). As such, DAT submits that no bond should be required.

Dated:  September 4, 2025

/s/ Ronald S. Lemieux

**Ronald S. Lemieux**
Squire Patton Boggs (US) LLP
1841 Page Mill Road, Suite 150
Palo Alto, CA 94304
Telephone: +1 650 856 6500
FAX: +1 650 843 8777
Email: ronald.lemieux@squirepb.com

**Kristin Lieske Bryan**
**Steven M. Auvil** (application forthcoming)
Squire Patton Boggs (US) LLP
1000 Key Tower, 127 Public Square
Cleveland, OH 44114
Telephone:  +1 216 479 8500
FAX:  +1 216 479 8780
Email: kristin.bryan@squirepb.com
Email: steven.auvil@squirepb.com

**Keith Bradley**
Squire Patton Boggs (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
Telephone: +1 303 894 6156
FAX: +1 303 894 9239
Email: keith.bradley@squirepb.com

Attorneys for Plaintiff DAT Solutions, LLC

**CERTIFICATE OF CONFERRAL PURSUANT TO LOCAL CIVIL RULE 7.1 AND 65.1**

Counsel for Plaintiff has conferred with Defendant (an unrepresented party) regarding the relief requested in this Motion. Counsel for Plaintiffs provided Defendant with actual notice of the time of filing the motion and copies of all pleadings and documents filed in the action to date or to be presented to the court at a hearing.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2025 I caused the foregoing paper to be served via mail to the person's last known address:

John Celoria
9098 W. Chestnut Ave.
Littleton, CO 80128

*/s/ Ronald S. Lemieux*
Ronald S. Lemieux